I, Marcel Behnen, being duly sworn, depose and state that:

**Introduction**

1.    I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety (KDPS) for about 15 years, the last 6.5 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance and firearm laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21

1

U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c); felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § ,

2.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices (collectively, the "**Subject Devices 7 & 8**[1]") and their contents:

  a.  **Subject Device 7**: Grey iPhone 13 Pro Max, Model A2484, IMEI 359836516779570, no case with a spiderman sticker.

  b.  **Subject Device 8:** Black Samsung Galaxy S22 Ultra, Model SM-S908U, IMEI 355796462897905, no case.

3.   **Subject Devices 7 & 8** were seized by KVET investigators during the arrest of Terrance MOORE ("T.MOORE") on July 26, 2023 at 701 E Michigan Ave, Kalamazoo, MI. **Subject Devices 7 & 8** are currently located at KDPS Headquarters (150 E Crosstown Pkwy, Kalamazoo, MI, 49001).

4.   The applied-for warrant would authorize the forensic examination of **Subject Devices 7 & 8** for the purpose of identifying electronically stored data particularly described in Attachment B.

---

[1] Subject Devices 1-6 were previously identified in a federal search warrant (1:23-mj-00109) authorizing the search of 6 cellular devices seized on March 2, 2023, during a search warrant 805 Hazard Ave, Kalamazoo, MI.

5.   I respectfully submit that there is probable cause to believe that evidence T.MOORE possessed with intent to distribute controlled substances, and conspired with others to do the same, in violation of 21 U.S.C §§ 846, 841(a)(1), will be found on **Subject Devices 7 & 8**.

6.   The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is probable cause for the requested search of **Subject Devices 7 & 8** and does not set forth all of my knowledge about this matter.

## Case Background Probable Cause

7.   On March 2, 2023, KVET investigators executed a State of Michigan search warrant[2] at 805 Hazard Ave, Kalamazoo, MI. The warrant was executed by members of Kalamazoo Metro SWAT (KM-SWAT). During the search warrant of the apartment, belonging to T.MOORE, several items were seized as evidence of drug trafficking:

   a.   On T.MOORE's person, a knotted sandwich bag containing 20 individually packaged baggies. Six of the 20 baggies contained a total of what the KDPS Crime Lab tested and verified as 5.88 grams of methamphetamine. The remaining 14 baggies contained a total of what the KDPS Crime Lab tested and verified was 2.65

---

[2] On March 1, 2023, KVET Investigator Trever Patterson obtained a State of Michigan search warrant signed by a Kalamazoo County District Court Judge.

3

grams of fentanyl. In my training and experience, the amounts and style of packaging of these controlled substances is consistent with an intent to distribute individually-packaged baggies of methamphetamine and heroin/fentanyl to user customers.

b. In a silver 2021 Nissan Altima was parked outside 805 Hazard Ave. Inside investigators located a loaded Walther PDP 9mm handgun in plain view on the front passenger seat. Several lottery tickets were also located in both front doors and the driver's visor. I know based on my training and experience that lottery tickets are commonly used as packaging for controlled substances, including heroin/fentanyl.

c. Inside the 805 Hazard Ave apartment investigators located:

- Lottery tickets throughout the house, to include living room and kitchen.

- In the living room closet, a knotted plastic baggie in the closet with a tan/white powder. The KDPS Crime Lab later determined that this was possible Benadryl, which I know is a common cutting agent for heroin/fentanyl.

- In the living room, a mini-arcade Pacman game, which contained three knotted sandwich bags hidden inside. Each of these three knotted bags contained four

      additional knotted sandwich bags. The KDPS crime lab tested the substance in these bags and verified that the bags contained a total of 333.98 grams of methamphetamine.

- In the kitchen, 3 digital scales, which I know based on my training and experience are tools that drug dealers use to weigh out their product for packaging and sale; protective gloves, a common tool for packaging; sandwich bags, which I know based on my training and experience is another common item used to package controlled substances, especially when found alongside the other aforementioned tools of the drug trade.

- In T.MOORE's bedroom: $4,825 in U.S. currency; a loaded Glock Gen4, 9mm handgun; a loaded extended Glock magazine; lottery tickets; and a money counter, which is another common tool of the drug trade, in my experience.

8. Several cell phones were also seized from the residence. On March 13, 2023, U.S. Magistrate Judge Phillip J. Green signed search warrant (1:23-mj-00109) authorizing the search of the cellular phones seized at 805 Hazard Ave on March 2, 2023. Subject Device-1 and Subject Device-6 were identified as belonging to T.MOORE based on forensic examination.

5

9.     I found evidence on Subject Device-1 indicating T.MOORE was utilizing his phone(s) to traffic controlled substance in the form of text messages and photos and videos. For example, I reviewed messages between T.MOORE and various known and unknown individuals, in which T.MOORE and these individuals discuss the prices for various controlled substances and coordinate delivery times and locations. I also found on this device photos of T.MOORE posing with large amounts of U.S. currency and photos of T.MOORE holding handguns, including a handgun with an extended magazine.

10.    On July 11, 2023, T.MOORE, was indicted by a grand jury in the Western District of Michigan (1:23-cr-00081-HYJ) on charges of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C §§ 846, two counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C §§ 846, 841(a)(1), and two counts of being a felon in possession of a firearm, in violation of 18 U.S.C 922(g)(1). A federal arrest warrant was issued for T.MOORE on the same date.

**Probable Cause Stemming from Arrest**

11.    On July 26, 2023, KVET investigators set out to arrest T.MOORE on the outstanding federal arrest warrant stemming from the July 11, 2023 indictment.

12.    Investigators located T.MOORE leaving 1429 Fox Ridge Drive, Kalamazoo, MI, getting into the passenger seat of a white Dodge Durango, with Michigan license plate "TAYMAH." Investigators continued surveillance of the vehicle until it parked at 701 East Michigan Ave. There KVET investigators

contacted the vehicle to arrest T.MOORE on the federal warrant.

13. While being taken into custody, T.MOORE was holding **Subject Device 7** in his hand and placed it into his pant pocket. The device was later seized from that location. T.MOORE also had on his person:

  a. $1,121 US Currency in his front pants pocket.

  b. A knotted baggie containing 1.19 grams of fentanyl was also located in his coin pocket.

  c. Several lottery tickets in his back pocket.

14. Investigators also located a sandwich bag full of torn off corner bags and ripped Michigan lottery tickets. This item was discarded by T.MOORE behind the vehicle according to a witness on scene.

15. **Subject Device 8** was located inside of a purple draw string backpack, which was on T.MOORE's lap when he was contacted by KVET.

16. Inside of the Dodge Durango, law enforcement found a loaded pistol tucked between the driver's seat and the center console. The driver of the car, not T.MOORE, has been charged in the State of Michigan for illegal possession of that firearm.

17. T.MOORE was interviewed on scene. T.MOORE denied knowledge of the gun located in the vehicle. T.MOORE said the drugs located on his person was cocaine and he was a user of cocaine and believed it to be about 1/10 of a gram.

18. Based on my training and experience, I know that drug traffickers frequently use more than one cell phone to conduct their drug trafficking business.

For example, I have encountered drug dealers that use one cell phone/phone number to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers.

19.     Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

  a.     Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

  b.     Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

  b.     Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

  d.     Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

  e.     It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial

8

instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers. These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

      f.    That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

      g.    User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

      h.    Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

### Technical Terms

20.    Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

  b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for

viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from

at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service

providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

21. Based on my training, experience, and research, I know that **Subject Devices 7 & 8** have capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and other evidence of drug trafficking.

### Electronic Storage and Forensic Analysis

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Subject Devices 7 &** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **Subject Devices 7 & 8** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

13

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Subject Devices 7 & 8** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Subject Devices 7 & 8** described in Attachment A to seek the evidence of drug trafficking described in Attachment B.